Henry Etta Cushing **LEWIS et al.,**
Appellants,

v.

David D. **CUSHING, Appellee.**

No. 7079.

Court of Civil Appeals of Texas.

Beaumont.

Sept. 4, 1969.

Robert D. Nogueira, Beeville, for appellants.

Paul Hill, Corpus Christi, for appellee.

KEITH, Justice.

The natural mother appeals from a judgment, based upon a jury verdict, which denied her suit for the custody of her three minor children. The initial tragedy of a teen-age marriage has now been compounded to involve the lives of not only these three unfortunate victims, but new spouses and children born of a second marriage of the father. When the father, David, was nineteen years old, he married the appellant, Henry Etta Lewis (known in our record as "Penny"), then of the tender age of sixteen

years. Enlisting in the Air Force in 1960, some five years after the marriage, David was assigned to an air base in Alabama. On December 12, 1961, a divorce was granted in Penny's suit which awarded the custody of the three children to David nine months of the year and to Penny for the remaining three months of each year. At the time of trial, Little Davey was thirteen years of age, Dorothy (Dodie) was twelve, and Danny was nine years of age.

Four days after the divorce, David married his present wife, Patricia, who was at that time a member of the Women's Air Force, a former baby sitter for David and Penny while they were married. To this marriage three children have been born. David has remained in the Air Force and has now advanced to the rank of sergeant and is stationed, more or less permanently, at Dayton, Ohio, after having served in several other areas, including Japan. He is buying a home in Dayton, has a comfortable income, security in his economic future, and there is no hint in the record that he is an unfit person to have the custody of the children involved here.

Penny, too, has improved her lot. From being a high-school drop-out at the time of the divorce, qualified to work only as a carhop in a drive-in stand, she has secured her high school diploma, some college credits, and was a secretary at the time she married Lawrence Lewis, a Navy Lieutenant, piloting jet planes from carriers. They have purchased a comfortable home in Beeville, Texas, where Lt. Lewis is presently stationed, and, like Sgt. Cushing, have a comfortable income and security of economic future. There is no intimation in our record that the Lewises are unfit to have the custody of the children.

The case was submitted to the jury on two issues, the first submitting the issue of a material change of conditions since the entry of the Alabama decree in 1961 (which the jury answered "Yes") and the second asking the jury to determine if the best interest of the children would be served by placing them with the mother or the father, to which the jury answered, "David D. Cushing." The judgment followed the verdict with custody being awarded to David with the right of Penny to visit with such children two weeks in each year. The decree contains elaborate provisions to insure the return of the children to the father at the conclusion of the annual two-week visitation period.

The record is lengthy with nearly four hundred pages in the statement of facts and a separate volume of exhibits. Penny comes forward with five points, the first four of which present evidence questions.[1] The fifth and final point raises the question of jury misconduct and we will reserve comment thereon until it is reached later in this opinion.

In passing upon the "no-evidence" point, to determine if there is any evidence to support the finding of the jury, we must consider only the evidence most favorable to the finding and disregard that which is opposed to it. Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609, 613, 23 A.L.R.2d 1114 (1950); however, as to the second and third points in the series raising the "sufficiency" question we will consider the entire record. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

The oldest boy, Davey, is a cerebral palsy victim and for the past several years has been under treatment in military hospitals, the treatment being furnished by reason of his father's military status. While there is no expert medical evidence in the record, it is reasonable to believe that continued treatment of this condition will be required in

1. The points: (1) no evidence to support the answer to Special Issue No. 2; (2) insufficient evidence to support such answer; (3) the answer is so contrary to and against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust; and (4)

only appellant (Penny) proved that it would be to the best interest of the children to be awarded to her (with appellee, David, making no such proof), for which reason the judgment is not supported by the evidence.

the foreseeable future. The two younger children are normal. Pat Cushing, the stepmother, has had the paramount responsibility of rearing the three children for nearly seven years immediately preceding the trial of the case. While she admits to being a "firm" disciplinarian, her husband, the father of the children terms her discipline "stern." However, the description given by each discloses that this exercise in semantics really means that she requires the children to mind and punishes them when they are disobedient.

Literally dozens of pages in our record are taken up with the account of the trials and tribulations of Sgt. Cushing in taking the children on the cross-country trips to allow them to visit their mother. One year, through a mix-up in communication, or otherwise, when he brought the children from Japan to California for the purpose of allowing them to visit their mother, the parents did not make contact and the children were returned to Japan without having visited their mother.

The mother, although not formally affiliated with any religious organization, appears from the record to have discharged the obligation of giving the children appropriate religious training, including formal church attendance while the children were with her. Lt. Lewis was not a member of any church. Both Sgt. Cushing and his present wife are members of a church and actively participate in religious activities.

■ Upon the trial, both parents gave testimony about an informal agreement which they had about the time of the divorce to the effect that the children would be allowed to choose the parent with whom they wanted to live when they reached the age of twelve years. The older daughter, Dodie, gave testimony before the jury, choosing her mother, and, although the reasons assigned were plausible, the jury found that it would be to her best interest for her to remain with her father. The court properly received this testimony [Callicott v. Callicott, 364 S.W.2d 455, 458 (Houston, Tex.Civ.App., 1963, error ref., n. r. e.)], but such testimony must be weighed along with the other testimony in determining the issue of custody. The child's choice is not necessarily a controlling factor. Dunn v. Jackson, 231 S.W. 351, 353 (Com.App., 1921, holdings approved); Doherty v. Dean, 337 S.W.2d 153, 156 (Austin, Tex.Civ.App., 1960, no writ). See also, Annotation, 4 A.L.R.3d, 1396 (1965).

We have carefully reviewed the record, being assisted by excellent briefs filed by counsel, and have come to the conclusion that the first three points raised by Penny must be overruled. The jury found, and no one challenges the finding (with which we agree), that there had been material changes in the condition of the parents since the entry of the Alabama decree.

The original Alabama decree granting the divorce simply approved the stipulation of the parties that the father should have the custody of the children "for a period of nine months out of the year, and the Complainant [mother] is awarded the care, custody, and control of said children the remaining three months out of the year." This record serves to convince us that Judge Alexander's language used in Martin v. Martin, 132 S.W.2d 426, 428 (Waco, Tex. Civ.App., 1939, no writ) is not only sound but peculiarly appropriate here:

> "In our opinion, the original decree awarding the child part time to each of the parents was unwise." [2]

The jury had the opportunity to consider all of the evidence, after seeing the witnesses and evaluating their testimony under instructions which are not attacked. The case being tried under Article 4639a, Vernon's Ann.Civ.St., the judgment followed

---

2. The remainder of this quotation from Judge Alexander in *Martin* is to be found in Judge Norvell's dissent in Leithold v. Plass, 413 S.W.2d 698, 704 (Tex.Sup., 1967) where the authorities on the ques-tion of divided custody are collated. As to the point which we have under consideration now, no difference between the majority and minority views in *Leithold* is apparent.

the verdict as required by the statute. We must place this verdict in the same category as a jury finding in any other case when it is attacked. Welch v. Welch, 369 S.W.2d 434, 437 (Dallas, Tex.Civ.App., 1963, no writ); Kirchner v. Van Skike, 410 S.W.2d 467 (Tyler, Tex.Civ.App., 1966, no writ); Heiskell v. Heiskell, 412 S.W.2d 774 (Amarillo, Tex.Civ.App., 1967, no writ); Huff v. Stafford, 429 S.W.2d 620 (Dallas, Tex.Civ.App., 1968, error dism.); Harrelson v. Davis, 415 S.W.2d 293 (Ft. Worth, Tex.Civ.App., 1967, no writ).

■ While the mother did succeed in showing a change in conditions occurring after the entry of the Alabama decree, she still faced the burden of convincing the trier of the facts that the best interest of the children would be served by awarding their custody to her. Her success in showing the changed conditions simply brought into operation the rule of law that the paramount question in all custody proceedings is to determine what is in the best interest of the children. Legate v. Legate, 87 Tex. 248, 28 S.W. 281, 282 (1894); Ex parte Eaton, 151 Tex. 581, 252 S.W.2d 557, 560 (1952); Callicott v. Callicott, supra (364 S.W.2d at p. 458); 20 Tex.Jur.2d, Divorce & Separation, § 322, p. 647. The mother, consequently, failed to carry the burden of establishing her right to a change of the custody of the children. The question was, however, very close and a finding in favor of Penny would have had ample support in the evidence.

The fourth point of Penny is in this language:

"The jury's answer to Special Issue No. 2[3] and the trial court judgment thereon are not supported by the evidence because Appellant pleaded and proved changed conditions and her fitness to have custody of the children and that it would be to their best interests that their custody be placed in Appellant, and Appellee wholly failed to prove to the contrary by evidence of probative force."

■ The burden was upon Penny to show not only the changed conditions, but to demonstrate such a change of conditions that would demand, in the best interest of the children themselves, that they be taken from their father's home and placed in hers. The Alabama decree was res judicata upon the question of the father's fitness to have custody of the children. Knowles v. Grimes, 437 S.W.2d 816, 817 (Tex.Sup., 1969), and cases therein discussed. We have held that there was sufficient evidence to support the jury's finding to Special Issue No. 2. Penny has failed to discharge *her* burden of showing that it was to the best interest of the children that their custody be changed. David had no such burden, supported as he was by the prior decree. So holding, Penny's fourth point is overruled.

The point on jury misconduct is not, in compliance with Rule 418(b), Texas Rules of Civil Procedure. It reads:

"The Honorable Trial Court erred in overruling Appellant's Amended Motion for New Trial because the jury was guilty of misconduct *in each of the particulars set out in the motion;* to which reference is here made; which misconduct directly caused the rendition of an improper and erroneous verdict as to Issue No. 2." (Emphasis supplied.)

The amended motion for new trial, the fifth ground therein, contains seven separate charges of jury misconduct, one of which has four subdivisions. The trial court heard evidence from six of the jurors and entered judgment overruling the motion for new trial without making any findings of fact or conclusions of law.

---

3. The issue read: "Do you find from a preponderance of the evidence that the care, custody and control of the minor children would best be served by placing their custody in their mother, Henry Etta Lewis, or their father, David D. Cush- ing?" The jury named the father. This is a permissible submission under the facts of this case. Rule 277, T.R.C.P.; Stone v. Texas Employers' Ins. Ass'n., 154 Tex. 21, 273 S.W.2d 59, 60 (1954).

Thus, under the rationale of Brawley v. Bowen, 387 S.W.2d 383, 384 (Tex.Sup., 1965), " * * * it is presumed on appeal that the trial court found all controverted facts in support of its judgment overruling the motion and that no misconduct occurred." Under such circumstances, the decision of the trial court " * * * is binding on appeal." Id.

■ Nevertheless, in compliance with Rule 422, T.R.C.P., and construing the requirements of Rule 418(b) liberally, we have searched the record, including volume 3 of the Statement of Facts which brings before us the testimony heard upon the motion for new trial. As to all but one of the complaints brought forward, the evidence was conflicting or at best inconclusive and the trial court's decision is binding upon us. *Brawley,* supra.

The future welfare of the children was in the hands of the jury by virtue of Special Issue No. 2. One of the factors considered by the jury, and properly so, was which of the parents could best provide an adequate education for the children. From the testimony of the six jurors who were heard upon the motion for new trial, it is apparent that the jury believed Lt. Lewis, because of his college degree, his training as a pilot, and age would probably be able to offer the children more financial assistance than could Sgt. Cushing. It will be recalled, however, that Lt. Lewis had testified that he intended to leave the Navy and become a civilian air-line pilot, a relatively lucrative pursuit. On the other hand, Sgt. Cushing was a career member of the Air Force, intending to remain therein until he retired. Lewis, consequently, had a greater potential earning capacity than did Cushing.

In this posture of the case, while the jury was in its second day of deliberations and working upon Special Issue No. 2 that the incident occurred which we now relate from the testimony of the Juror Barham:

"Q. * * * was education discussed?

"A. Yes, sir.

"Q. Was it discussed extensively?

"A. Yes, sir.

    \*       \*       \*       \*       \*       \*

"Q. * * * was there a decision made that Lieutenant Lewis could probably afford to give them a better education because he was an officer than Mr. Cushing could because he was a sergeant?

"A. Well, the argument came out that he [Lewis] could because of his education, his potentials were better and * * * he could probably give the children a better education because of his education and it was brougt out.

"Q. * * * Now, following that did Mrs. Barris [a juror] have something to say about a government program for enlisted men's children on education?

"A. Yes, sir.

·Q. Tell the Court what Mrs. Barris said.

"A. Well, it seemed that education was a very important feature and it was in my decision, in which way I would vote and in the discussion it would always be the three children that Mr. Lewis would take care of and then some of the jurors that felt that the father should have the—well, the discussion would come that it would be six on the side of the father and some of the jurors brought out that we were not concerned on six children but three children so when Mrs. Barris brought out that there was an education fund for these children that influenced my vote.

"Q. All right, did she say that this educational fund was a government fund provided for enlisted men's children?

"A. I believe that's what she said.

"Q. All right, and you knew that she was the wife of a Marine Major, did you not?

"A. Yes, sir.

"Q. And she told the jury that she was familiar with these government programs, didn't she?

"A. Yes, sir.

"Q. And as you say in your affidavit she spoke in a very authorative manner about the matters as though she really had the straight dope on it.

"A. Yes, sir.

"Q. Now, these matters that you have testified to Mrs. Barham were persuasive, were they not?

"A. To me they were.

"Q. And but for them would you have rendered such a verdict as you did?

"A. No, sir. * * * "

The Juror Dunlap gave somewhat similar testimony and stated that after the discussion of the government-sponsored educational program available to Sgt. Cushing, the jurors "began to drop over one by one." [4] Juror Cooper, commenting upon Mrs. Barris' statement about the government aid or scholarship available to Sgt. Cushing, "she said it like she knew what she was talking about."

Mrs. Barris was called by Sgt. Cushing's counsel and her testimony is now stated:

"Q. Was there any discussion on your part with respect to the education of the Cushing children during the deliberations?

"A. Yes, sir.

"Q. What was the nature of the discussion?

"A. Well, of course, some of the other members of the jury were talking about, something was mentioned about their education of them and they were looking into the financial aspects and I don't remem-

ber who mentioned it or anything but we all talked about the education of the Cushing children and I think it was a concern that perhaps it was mentioned that Lieutenant Lewis' financial ability he would be able to educate the children better and I think several, *I mentioned* and I think several others mentioned *that there were grants, government loans available to people not only civilians but of course military personal* [sic] *depending on their need or their—well, it all depends on their need and the number of children they take all this into consideration."* (Emphasis supplied.)

On cross-examination, Mrs. Barris did not deny that the government aid would probably be available to Sgt. Cushing, this being the question:

"Q. * * * so that the [educational] program that you were talking about and the others were talking about was designed to help people in Mr. Cushing's station in life rather than say Lieutenant Lewis when he became an airline pilot?

"A. Yes."

She readily admitted on cross-examination that there was no testimony adduced upon the trial which would form the basis of any such discussion.

Juror Denson, admitting a discussion of the education of the children, did not, unequivocally, deny the fact that Sgt. Cushing might have governmental benefits available which would not be available to Lt. Lewis.

The jury foreman, Gardner, offered as a witness by Sgt. Cushing, testified on cross-examination about the education of the children:

"Q. * * * Isn't it true also that in this discussion about education one of the jurors mentioned that there was a *program of government aid*

4. See in this connection Butler v. Haynes, 426 S.W.2d 642, 644, Syl. 3 (Beaumont, Tex.Civ. App., 1968, error ref. n. r. e.).

where Mr. Cushing being an enlisted man could get some scholarship money or something like this for the children so that they could get a full education, do you remember that?

"A. Seems like that it was brought up.

"Q. All right, let me just pinpoint it for you. Isn't it a fact that Mrs. Barris, JoAnn Barris is the one who said or who made known that her husband was a marine major, that she was a service wife and she is the one who told the jury that this program was available to enlisted men so that they could educate their children. Now, that is a fact, isn't it?

"A. I can't say that it is, you are going back there, I can't remember.

"Q. Okay, you don't know who brought it up but it was discussed?

"A. I am sure it was.

"Q. As I have said it was discussed.

"A. Yes."

█ Our review of the testimony given at the hearing on the motion for new trial leads us ineluctably to the conclusion that the jury did receive testimony during their deliberations which was not presented during the trial in the courtroom. The receipt of new testimony on a material issue during the deliberation on the verdict constitutes misconduct. Akers v. Epperson, 141 Tex. 189, 171 S.W.2d 483, 486, 156 A.L.R. 1028 (1943); City of Houston v. Quinones, 142 Tex. 282, 177 S.W.2d 259, 263 (1944).

It was said in Crawford v. Detering Co., 150 Tex. 140, 237 S.W.2d 615, 617 (1951):

"Under Rule 327 of the Texas Rules of Practice and Procedure in Civil Actions, the plaintiff in this case was required to show, in order to obtain a new trial upon the grounds of jury misconduct that (a) the misconduct complained of in fact occurred, (b) it was material, and (c) it

was calculated to and probably did result in harm to him."

Penny has established that the jury did consider testimony in the jury room during their deliberations which came from a juror, not a witness. This constitutes misconduct under Akers v. Epperson, supra. She has, therefore, satisfied the first requirement under Crawford of showing that the misconduct "in fact occurred." Having so established misconduct, the rule is stated in Quinones, supra (177 S.W.2d at 263):

"Misconduct of the jury having been established, the question of probable injury becomes one of law for the courts. In considering this matter the courts will examine the entire record in the case."

See also: St. Louis Southwestern Ry. Co. v. Gregory, 387 S.W.2d 27, 31 (Tex.Sup., 1965).

The education of these three unfortunate victims of this domestic tragedy was of importance to the court and to the jury. Which of the contending male parties, the father or the step-father, could afford the greater educational opportunity was a proper subject of discussion by the jury. Cf. Allen v. Riedel, 425 S.W.2d 665, 677 (Eastland Tex.Civ.App., 1968, no writ). The evidence received for the first time in the jury room was, consequently, material, thereby satisfying the second requirement of Crawford, supra.

Speaking of the burden of showing probable injury, our Supreme Court said in Texas Employers' Ins. Ass'n v. McCaslin, 159 Tex. 273, 317 S.W.2d 916, 918 (1958):

"There is no requirement that the party asserting error must show injury beyond a reasonable probability in order to secure a reversal of a judgment."

Citing Texas & Pacific Ry. Co. v. Gillette, 125 Tex. 563, 83 S.W.2d 307, 309 (1935) decided under the old rule of presumed error, the Supreme Court, in Gregory, supra (387 S.W.2d at 32):

"However, it is a sound rule which requires that a new trial be granted if the

verdict of even one juror is affected by misconduct."

Here, the evidence offered on the motion for new trial established that the verdict of more than one juror was affected by the misconduct, meeting the third requirement of *Crawford,* supra.

The extreme closeness of the evidence on the basic question submitted to the jury in Special Issue No. 2, considering the record as a whole, that is upon the main trial and upon the motion for new trial, the misconduct of the jury has tipped the scales; and, in our opinion, appellant has discharged her burden. Texas Employers' Ins. Ass'n v. McCaslin, supra (317 S.W.2d at p. 921, syl. 7).

Reversed and remanded.